■ LYUDMILLA KRAPIVKA, as Administratrix of the Estate of ARKADY KRAPIVKA, Deceased, Resondent, v MAIMONIDES MEDICAL CENTER et al., Appellant.—In an action to recover damages, *inter alia,* for wrongful death based on psychiatric malpractice, the defendants appeal from a judgment of the Supreme Court, Kings County (Monteleone, J.), dated July 6, 1984, which, after a jury trial, is in favor of the plaintiff in the principal amount of $616,870.75.

Judgment reversed, on the law and the facts, with costs, and complaint dismissed.

The record does not support the jury's finding that the defendants' staff failed to take a proper medical history of the plaintiff's intestate, Arkady Krapivka, and that the failure to do so was a departure from good and accepted medical practice which caused or contributed to his death. The absence of

a notation in the decedent's hospital records indicating that the decedent was questioned about prior suicide attempts and that there was a family history of suicide is not proof that the decedent was not so questioned *(see, Topel v Long Is. Jewish Med. Center,* 55 NY2d 682, 684). Furthermore, three members of the defendants' psychiatric staff testified that the decedent's psychiatric history was taken as part of routine procedure and that the decedent denied having made any prior suicide attempts. A positive response would have been recorded.

The failure of the defendants' staff to question the decedent's wife, his rabbi, the doctor who drove him to the hospital and the psychiatrist who previously met him for one treatment session regarding the decedent's psychiatric history was also not a deviation from accepted medical practice which proximately caused or contributed to his death, since the plaintiff wife admitted that she purposely withheld information about the decedent's prior suicide attempts, and the other persons had little or no relevant information to offer. In any event, there is no indication that more stringent supervision and restrictions would have been mandated had the hospital known of the decedent's prior suicide attempts *(see, Weglarz v State of New York,* 31 AD2d 595, 596).

Therefore, the decision of the defendants' staff not to place the decedent in the intensive care unit of its psychiatric ward and to allow the decedent some measure of freedom within the ward for therapeutic purposes was not one made without a proper medical foundation *(see, Bell v New York City Health & Hosps. Corp.,* 90 AD2d 270, 280-281). As it has frequently been said, "[t]he prediction of the future course of a mental illness is a professional judgment of high responsibility and in some instances it involves a measure of calculated risk" *(Centeno v City of New York,* 48 AD2d 812, 813, *affd* 40 NY2d 932; *Taig v State of New York,* 19 AD2d 182, 183; *see, Topel v Long Is. Jewish Med. Center, supra).* Liability cannot be based merely upon the disagreement of another physician with the manner in which treatment is provided *(see, Topel v Long Is. Jewish Med. Center, supra; Centeno v City of New York, supra).*

Our dissenting colleague would affirm on the ground that there was a question of fact concerning whether the medical decisions of the defendants' staff were without proper medical foundation. While agreeing that the record supports a finding that the decedent's psychiatric history was taken, it is argued that it was for the jury to decide whether the failure on the part of the staff to question the plaintiff wife about any prior suicide attempts by her husband was a deviation from ac-

cepted medical practice. We do not agree that the record is devoid of any express indication that the plaintiff wife would have withheld this information "if she had been formally asked". The plaintiff wife and her husband were recent Soviet emigrès. The plaintiff wife testified that she went with an interpreter to the hospital on February 5, 1980, because she was afraid that her husband would be released. She wanted to talk to the doctors "to explain to them his situation * * * to explain to them that his state would be very bad if he went home". In spite of the plaintiff's fear for her husband's safety, she did not reveal his prior suicide attempts. When initially asked why she didn't speak to the doctors, she stated, "[i]f they knew at the immigration that he had a history of mental disease, they wouldn't let him come here". The plaintiff wife further stated that she was fearful that her husband would be deported after he was released from the hospital, and added that, "in the Soviet Union, we don't have the habit of telling things to doctors". The plaintiff wife subsequently expressed a fear of what the authorities might do to her and her child if she revealed her husband's psychiatric history. With special reference to her husband's suicide attempts, she felt that if she told the doctors, the family might be sent back to the Soviet Union.

It is clear that the plaintiff wife took the only course that she perceived to be available to her in order to protect her family's status in the United States while at the same time preventing the release of her husband. She revealed that her husband's father had committed suicide. This information did, indeed, result in the hospital's decision not to release the decedent. The record clearly exhibits the conflicting pressures on the plaintiff wife and her determination not to reveal her husband's prior suicide attempts. That determination continued right up until the time of the trial, when she revealed, for the first time, that her husband had attempted suicide both in the Soviet Union and the United States. The record indicates that during pretrial depositions, the plaintiff wife tenaciously refused to reveal that history—even upon formal questioning under oath. She was asked if prior to his hospitalization, her husband had ever attempted to take his own life in the time that she had known him. She answered "No". Accordingly, we cannot agree that the record presents any issue of fact as to whether the plaintiff wife would have revealed her husband's prior suicide attempts, had the defendant's staff questioned her in that regard, and therefore we vote to reverse and dismiss the complaint. Gibbons, Lawrence and Kunzeman, JJ., concur.

Mangano, J. P., dissents and votes to affirm the judgment, with following memorandum.

The instant action was commenced by the plaintiff, *inter alia,* to recover for the wrongful death of her husband who committed suicide by hanging himself with a belt on February 6, 1980, while he was a patient at the defendant hospital's mental health center.

At the conclusion of the trial testimony, the trial court asked the jury to consider, *inter alia,* the following three questions:

"1: Did the plaintiff Mrs. Krapivka sustain her burden of proof that the defendant Maimonides Hospital failed to properly supervise the decedent Arkady Krapivka and that such failure was a departure from good and accepted medical practice proximally causing or contributing to his death?
* * *

"2: Did the plaintiff Mrs. Krapivka sustain her burden of proof that the failure to remove Arkady Krapivka's belt was a departure from good and accepted medical practice proximally causing or contributing to his death? * * *

"3: Did the plaintiff Mrs. Krapivka sustain her burden of proof that the defendant Maimonides Hospital failed to take a proper history and that such failure was a departure from good and accepted practice causing or contributing to the death of Arkady Krapivka?"
The jury found in favor of the plaintiff wife on all three questions.

The majority is of the view that, as a matter of law, liability may not be imposed upon the defendants under any of these three questions because "[t]he prediction of the future course of a mental illness is a professional judgment of high responsibility and in some instances it involves a measure of calculated risks" *(Centeno v City of New York,* 48 AD2d 812, *affd* 40 NY2d 932; *Taig v State of New York,* 19 AD2d 182, 183). Although I agree with the majority that no liability may be imposed on the defendants with regard to the first two questions posed to the jury, I respectfully differ with the majority regarding the last question. In my view, a question of fact existed on this record with regard to the last question posed to the jury, i.e., the failure to take a proper history, and the judgment based upon the jury's affirmative answer to that question should not be disturbed.

The courts have refused to impose liability for psychiatric malpractice unless there is something more than an error of

judgment *(see, e.g., Cohen v State of New York,* 51 AD2d 494, 496, *affd* 41 NY2d 1086). However, it has also been held that "[a] decision that is without proper medical foundation, that is, one which is not the product of a careful examination, is not to be legally insulated as a professional medical judgment" *(Bell v New York City Health & Hosps. Corp.,* 90 AD2d 270, 280-281; *see also, Huntley v State of New York,* 62 NY2d 134).

The record in this case, it is true, supports a finding that the decedent's psychiatric history was taken from the decedent upon his admission and that the decedent at all times denied having made prior suicide attempts. The plaintiff wife, however, testified that she knew that her husband had previously attempted to commit suicide, and members of the defendants' staff admitted, during their trial testimony, that had they possessed the knowledge of those previous suicide attempts they "might have" changed the decedent's treatment program or "could have made" a different determination regarding the level of supervision and restrictions placed on the decedent. Nevertheless, the record indicates that members of the defendants' staff never asked the plaintiff wife about any previous suicide attempts by her husband. Specifically, the record indicates that after the plaintiff wife went to the hospital on February 5, 1980, and volunteered the fact that the decedent's father had committed suicide, the defendants' staff members merely reassured her "not to worry, everything would be fine".

The defendants argue that the decision to accept the answers given by the patient to queries about his or her psychiatric history and to refrain from pursuing the matter with the patient's spouse is within the realm of professional judgment. In this regard, one of the defendants' physicians agreed that the decision to "obtain information from members of the family" is "a matter of judgment" determined by "how much information you're getting from the patient, the degree to which you feel he is relating to you". However, one of the defendants' staff physicians who examined the decedent during his stay specifically admitted during his testimony that he "couldn't put any weight" on the decedent's denials because of his experience with Russian emigrès, whom he found to be "very frightened". Under these circumstances, it was for the jury to decide whether the failure on the part of the defendants' staff to question the plaintiff wife about any prior suicide attempts on the decedent's part was, as the plaintiff's expert testified, a deviation from accepted medical practice on

the ground that the "opportunity to form a medical judgment was foreclosed by" that failure *(see, Huntley v State of New York, supra,* p 137).

The majority is of the view that any failure of the defendants in this regard was not the proximate cause of the decedent's death, as a matter of law, in view of the plaintiff's admission during the trial that she would not have divulged any information about her husband's prior suicide attempts. I disagree with this conclusion.

The record simply indicates that the plaintiff had decided not to volunteer this piece of information because of her fear of possible deportation. The record is devoid, however, of any express indication that the plaintiff wife would have withheld this information if she had been formally and properly asked by a psychiatrist. The issue of proximate cause, therefore, like that of malpractice was for the jury to decide.

Accordingly, I dissent and vote to affirm the judgment in favor of the plaintiff.